**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

JAMIE ALBERTO TORRES SOTO,

      Plaintiff,

v.

CITY OF AURORA, COLORADO;
OFFICER ETHAN YAZDANI, in his individual capacity;
SERGEANT REGINALD DEPASS, in his individual capacity;
OFFICER KRISTI MASON, in her individual capacity;

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Jamie Alberto Torres Soto, by and through his attorneys Mari Newman and

Andrew McNulty of KILLMER, LANE & NEWMAN, LLP, in cooperation with Mark Silverstein and

Rebecca Wallace of the AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF COLORADO,

respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1.      On November 21, 2018, Jamie Alberto Torres (Mr. Torres) was fixing a car in his

garage with friends when a neighbor complained about noises coming from the garage.  Two

Aurora law enforcement officials, Defendants Ethan Yazdani and Reginald DePass, came to Mr.

Torres' home solely to investigate this noise complaint. During the course of the investigation,

these Aurora officers brutalized Mr. Torres, who behaved peacefully and respectfully during the

entire encounter. Defendant Yazdani illegally ordered Mr. Torres to exit his own garage,

1

threatening to take Mr. Torres to jail. Because Mr. Torres paused momentarily before complying with Defendant Yazdani's illegal order, Defendant Yazdani grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, Defendant Yazdani continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain.

2. Aurora officers immediately began the cover-up. While Mr. Torres was being assaulted by Defendants Yazdani and DePass, his wife, Maria Ibarra, attempted to film the violence. Another Aurora police officer, Kristi Mason, prevented Ms. Ibarra from recording the encounter so as to avoid memorializing her fellow officers' unconstitutional actions. To justify their illegal conduct, the Defendant officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury acquitted Mr. Torres of these charges at trial. The Aurora Police Department investigated its officers' use of force against Mr. Torres and found no wrongdoing.

3. This act of brutalization and cover-up by Aurora police officers follows a disturbing pattern by Aurora law enforcement of using force against people of color that would not be used against similarly situated white arrestees. Over the past few years, Aurora officers have customarily utilized objectively unreasonable force against people of color engaged in at most minor misconduct (*e.g.*, a noise violation), often injuring and sometimes killing them. In these cases, to justify the excessive use of force, Aurora officers charge their victims with crimes stemming solely from the police interaction, such as resisting arrest and/or failure to obey a lawful order. Even when the charges are dismissed or the victim is acquitted, the City of Aurora finds no wrongdoing by the officers, and the cycle continues. Mr. Torres seeks to hold Aurora

and its officers accountable for their unconstitutional actions. He brings this Complaint and Jury Demand to vindicate his Fourth and Fourteenth Amendment rights.

## JURISDICTION AND VENUE

4.    This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

5.    Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

7.    At all times relevant to this complaint, Plaintiff Alberto Torres was a resident of the State of Colorado.

8.    Defendant City of Aurora, Colorado ("Aurora") is a Colorado municipal corporation.

9.    At all times relevant to this Complaint and Jury Demand, Defendant Officer Ethan Yazdani was a resident of the State of Colorado. At all relevant times, Defendant Yazdani was acting within the scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

10.    At all times relevant to this Complaint and Jury Demand, Defendant Officer Reginald DePass was a resident of the State of Colorado. At all relevant times, Defendant

3

DePass was acting within the scope of his official duties and employment and under color of

state law in his capacity as a sergeant for the Aurora Police Department.

11.  At all times relevant to this Complaint and Jury Demand, Defendant Officer Kristi

Mason was a resident of the State of Colorado. At all relevant times, Defendant Mason was

acting within the scope of her official duties and employment and under color of state law in her

capacity as a police officer for the Aurora Police Department.

12.  Throughout this Complaint and Jury Demand, when referring to Defendants

Yazdani, DePass, and Mason in their individual capacities as law enforcement officers for the

Aurora Police Department, the moniker "Individual Defendants" is used.

### FACTUAL ALLEGATIONS

**A.  Aurora law enforcement officials, Defendants Ethan Yazdani and Reginald DePass, unlawfully brutalized, arrested, and racially targeted Alberto Torres.**

13.  Shortly after midnight, on November 21, 2016, Jaime Alberto Torres Soto was

finishing up working on the muffler of a truck in the garage of his home. With him were two

friends. Mr. Torres is a brown-skinned Latino man who speaks Spanish. He speaks very little

English and does so with a thick accent. Both of Mr. Torres' friends who were present on

November 21, 2016, were Latino men who spoke English as a second language and did so with a

thick accent.

14.  As Mr. Torres and his friends finished their work on the vehicle, police were

dispatched to Mr. Torres' garage. A neighbor had called 911 and complained that Mr. Torres and

his companions were making noise while working on a truck in the garage and alley.

4

Importantly, the 911 caller reported that one of the men in the garage lives there, that no one was in immediate danger, and that she did not think any weapons were involved.

15.    Defendant Aurora Police Officer Ethan Yazdani was the first to arrive on scene. He heard multiple people talking and laughing from an open garage. There was a truck parked in the garage that was obstructing the garage entrance.

16.    Any reasonable officer would have known that Mr. Torres' garage is within the curtilage of his home.  The garage was within the property line possessed by Mr. Torres and his wife, Maria Ibarra. The garage is located approximately fifteen feet from his back door, just across a small backyard from the house.  Mr. Torres' fenceline (a six-foot tall wooden fence) runs on both sides of the property from the house directly to the garage, so that the fence together with the garage and house create a complete enclosure of the small residential plot.  As Officer Yazdani saw as he approached the garage, Mr. Torres used the garage to store personal items, including tools and a vehicle, and he used the space to fix cars with his friends.  Mr. Torres generally kept his garage door closed and locked, but had the door temporarily open in order to accommodate the large truck he was fixing.

17.    When Defendant Yazdani reached the garage and peered in, he observed the three men casually standing in the garage, laughing, talking, listening to music and putting tools away.

18.    Defendant Yazdani contacted the men. Upon initial contact, all three men were polite and courteous toward Defendant Yazdani. Defendant Yazdani asked whether any of the men lived at the home, and one of Mr. Torres' friends answered affirmatively that one of them did live at the house.

5

19.     Defendant Yazdani told the three men that he had received a complaint that they were being noisy. One of the men told Defendant Yazdani that they weren't trying to be noisy, that they were simply fixing the truck that was parked in the garage.

20.     One of Mr. Torres' friends explained to Defendant Yazdani that they had just finished fixing the truck and were preparing to leave.

21.     Defendant Yazdani informed the men that they were being too loud.

22.     Defendant Yazdani then demanded that all three men provide identification. He made the request in both English and Spanish, demonstrating that he had a working knowledge of the Spanish language. Defendant Yazdani also directed the men to exit the garage. Mr. Torres' two friends exited the garage, but Mr. Torres remained in his garage to place a call to his wife, Ms. Ibarra, who was inside the house. Because Mr. Torres speaks very little English, he wanted to request that she come outside to translate.

23.     At this time, Defendant Sergeant Reginald DePass arrived on scene. Immediately upon his arrival, Defendant DePass took a hostile tone and falsely told two of the men that fixing a truck in one's own garage is illegal.

24.     When Mr. Torres did not immediately exit the garage, Defendant Yazdani asked Mr. Torres' two friends if there was a reason that Mr. Torres would not come out. One friend replied that Mr. Torres' wife spoke English and that Mr. Torres was calling her to ask her to come outside and translate. When Defendant Yazdani asked whose house this was, one of the men indicated that it was Mr. Torres' house.

25.     While Mr. Torres stood in the garage on the phone with his wife, both of his hands were visible to Defendant Yazdani.

6

26. Defendant Yazdani ordered Mr. Torres out of the garage using Spanish, stating "Venga aqui!"

27. Mr. Torres utilized his extremely limited English skills to explain in a thick accent: "I am in my house."

28. Defendant Yazdani then raised his voice and yelled hostilely in English: "Come here or you're going to jail! This is a lawful order to come here." Defendant DePass also yelled at Mr. Torres: "You're going to come here or you're going to jail!" Mr. Torres again calmly replied, "This is my house." When Mr. Torres did not come out, Defendant Yazdani stated: "OK, that was your lawful order" and began approaching the garage, clearly intending to enter and bring Mr. Torres out.

29. Defendant Yazdani reached for his holster and put his hand on his gun as he approached.

30. Fearful of the gun, Mr. Torres calmly began to exit the garage with his hands visible so the officer could see them.  As Mr. Torres peacefully exited, Defendant Yazdani violently grabbed Mr. Torres' wrist and forcefully wrenched it behind his back. Mr. Torres had a previous shoulder injury and Defendant Yazdani's use of force caused him immense pain. Mr. Torres screamed out in agony. As Defendant Yazdani grabbed Mr. Torres, Defendant DePass also forcefully grabbed Mr. Torres.

31. After grabbing and wrenching Mr. Torres' arm behind his back, Defendant Yazdani issued a number of commands in English, despite the fact that he knew Mr. Torres did not speak English. Mr. Torres did not fully understand what Defendant Yazdani was saying, but attempted to comply with these commands.  For instance, Defendant Yazdani ordered Mr. Torres

in English to put his left hand on his head for hand-cuffing. Confused, Mr. Torres attempted to calmly place his right hand on his head while meekly asking Defendant Yazdani, "it's ok?" to signal his submission to the officer.  But Defendant Yazdani escalated his use of force and yelled at Mr. Torres, "No, it's not ok!"

32.    Mr. Torres, confused, scared, and clearly in excruciating pain, repeatedly called to his wife, Ms. Ibarra, who was now outside, and screamed, in Spanish, that Defendant Yazdani was twisting his arm. Mr. Torres' words and body language begged Defendants to stop their use of force by indicating to them that he was in tremendous pain. It was also clear to Defendants Yazdani and DePass from Mr. Torres' blood-curdling screams that every time they wrenched Mr. Torres' arm behind his back, they caused him immense pain.

33.    While Mr. Torres' arm was restrained behind his back by Defendant Yazdani and his left hand was restrained on his head by Defendant DePass, both officers picked Mr. Torres off his feet and slammed him into the ground.

34.    With Mr. Torres laying on the ground, Defendant Yazdani and Defendant DePass held Mr. Torres face-down and handcuffed him.

35.    Then while Mr. Torres was still handcuffed and laying face-down, Defendant Yazdani slammed Mr. Torres' face into the ground.

36.    The actions of Defendant Yazdani and Defendant DePass in wrenching and twisting Mr. Torres' arms behind his back and slamming Mr. Torres' face into to the ground caused Mr. Torres to suffer a large contusion above his right eye, cuts to his face, a closed head injury, significant damage to his shoulder, and trauma to his back.

8

37.     At no point during the encounter did Mr. Torres resist Defendants' unlawful actions in placing him under arrest, handcuffing him, or using force against him. In fact, at no point during the encounter was Mr. Torres resisting the officers in any way, shape, or form. Mr. Torres did not attempt to flee at any point. Mr. Torres was also unarmed, and it was clear to Defendants Yazdani and DePass that he was unarmed.

38.     Throughout the arrest, Mr. Torres continued to submissively repeat, "it's OK?, it's OK?" and at one point said "excuse me." Through the entire encounter, Mr. Torres said nothing that could even remotely be perceived as threatening or combative.

39.     Defendant Yazdani eventually walked Mr. Torres to a squad car and again instructed him that if he resisted at all he would be thrown to the ground again. While walking Mr. Torres to the car, Defendant Yazdani gratuitously wrenched Mr. Torres' arms behind his back, causing Mr. Torres to cry out in pain again.

40.     At the squad car, Defendant Yazdani demanded in English and in Spanish that Mr. Torres separate his feet,. As Mr. Torres attempted to comply, Defendant Yazdani again gratuitously wrenched Mr. Torres' arms behind his back, again causing Mr. Torres to cry out in pain.

41.     Defendants called paramedics to the scene to assess Mr. Torres' injuries. The paramedics noted a hematoma on Mr. Torres' eyebrow and a laceration across the bridge of his nose. Mr. Torres was suffering from a severe headache from his head hitting the concrete and told the paramedics as much. Aurora Fire Department Emergency Medical Services also assessed Mr. Torres' injuries and found "a golf ball sized hematoma above his right eye."

9

42.    Mr. Torres' facial injuries are readily apparent in this photograph taken immediately after the incident:



43.    After a brief assessment at the hospital, Mr. Torres was booked into the Aurora Detention Center.

10

44.    Aurora charged Mr. Torres with three municipal violations: (1) disturbing the peace – loud/unusual noises; (2) resisting arrest, and (3) failure to obey a lawful order. His bond was set at $1,000. Through a bonding agent, Mr. Torres able to post his bond.

45.    The City of Aurora pursued prosecution of these three charges.

46.    After a trial, a jury found Mr. Torres not guilty on the charges of resisting arrest and disorderly conduct.

47.    The jury found Mr. Torres guilty of the noise violation, a charge for which he would have willingly pleaded guilty had he not also been falsely charged with the more serious offenses of resisting arrest and failure to obey a lawful order. Defendants, and Aurora, falsely charged Mr. Torres with resisting arrest and failure to obey a lawful order as part of the cover-up of their use of excessive force. It is customary in Aurora for officers to use excessive force against people of color and then charge them with bogus and trumped up offenses so as to conceal that fact that the officer used excessive force. These charges are most often resisting arrest, obstruction, failure to obey a lawful order, or a combination thereof.

48.    After the jury acquitted Mr. Torres on resisting arrest and failure to obey a lawful order, the Aurora Municipal Judge sentenced Mr. Torres on the noise violation. At sentencing, the Aurora Municipal Judge ignored the jury's findings that Mr. Torres was innocent of all but being too noisy by lecturing Mr. Torres regarding his purported failure to listen to police directives. While holding up a photo of Mr. Torres' battered face, the Aurora Municipal Judge placed the blame for Mr. Torres' injuries directly on Mr. Torres, warning that "when a police officer tells you to do something, you do it.  As a result, this kind of stuff happens."

11

49.    With these statements, the Aurora Municipal Judge endorsed the known custom and practice in Aurora that anything but immediate, unquestioning compliance with police orders (even if the police orders are unlawful), particularly by people of color, is met with physical aggression, excessive force, and criminal charges by Aurora police officers.

**B.    <u>Defendant Kristi Mason immediately attempted to cover up the Individual Defendants' violation of Mr. Torres' rights by preventing his wife, Maria Ibarra, from recording their illegal conduct, and failed to intervene to prevent their use of excessive force.</u>**

50.    During the encounter between Mr. Torres and Defendants, Maria Ibarra, Mr. Torres' wife, attempted to record the police brutality unfolding in front of her.

51.    Shortly before Mr. Torres was thrown to the ground, Ms. Ibarra came outside and attempted to ask officers why her husband was being detained. Then, as Mr. Torres continued to cry out in pain, Ms. Ibarra pulled out her cell phone and attempted to record the encounter. As soon as Ms. Ibarra pulled out her cell phone, Defendant Kristi Mason physically obstructed her by blocking her from recording the encounter.  Defendant Mason then ordered Ms. Ibarra off of her own property and directed her to move across the alley. Ms. Ibarra complied for fear of being arrested (or worse), and was unable to record Defendants brutalizing her husband.

52.    Defendant Mason, while purposefully inhibiting Ms. Ibarra's ability to record the other Defendants' use of force, also observed that use of force. Despite witnessing her fellow officers engage in this force, Defendant Mason failed to intervene to prevent their continued use of excessive force.

53.    When Ms. Ibarra began recording, she was standing at least five feet away from Defendants who were assaulting Mr. Torres. Ms. Ibarra was not interfering with Defendants. Ms. Ibarra's videotaping of the encounter from the alleyway would not have interfered in any way

with Defendants' arrest of and use of force on Mr. Torres. Despite this, Defendant Mason purposefully prevented her from recording this instance of police brutality.

54. Defendant Mason's obstruction of Ms. Ibarra's recording was the first step in a cover-up of Defendant Yazdani's and Defendant DePass' beat-down of Mr. Torres. Defendant Mason prevented Ms. Ibarra from recording so that there would be no clear, third-person evidence of Defendants' use of excessive force.

55. In recent years, many videos of the police injuring and sometimes killing people of color have fueled public outrage, and have led to some officers who have perpetrated these constitutional violations being prosecuted, fired, and disciplined. These videos have sparked a broader conversation about the role of police in society, and the role of racial bias in policing.

56. As police began to disburse from the scene, Mr. Torres was taken to the hospital. Before leaving the scene, one officer who had assisted in the arrest told another officer that Mr. Torres had asked the officers to return his identification to Ms. Ibarra and provide her an update. Another officer refused the request and said he was taking the identification to jail. A third officer said, "We don't need to go let her know. Let's get the fuck out of here. We don't owe these people nothing."  The officer Mr. Torres had originally asked to update Ms. Ibarra chose to go ahead and talk with her and then returned to the squad car, where another officer harassed his fellow officer for engaging in this simple act of human dignity, saying, "What, do you guys want to move in with them, ask them for dinner? Let's get the fuck out of here."

**C.** **Defendant Aurora abjectly failed to discipline the Individuals Defendants for their use of excessive force.**

57. On the day of the incident, Defendant Yazdani filed a use of force report that provided basic information about Mr. Torres' injuries.

58.     Aurora assigned Defendant DePass, who had also used gratuitous and excessive force against Mr. Torres, to review the use of force report and determine whether Officer Yazdani's actions violated Aurora's policies.

59.     Predictably, Defendant DePass concluded that Defendant Yazdani had engaged in no wrongdoing.  With the fox guarding the henhouse, it is unsurprising that Aurora did not discipline Defendant Yazdani for his use of force.

60.     Indeed, Aurora ultimately concluded that the use of force by Defendants Yazdani and DePass was "reasonable, necessary and justified" and "complied with Department Directives and law."

61.     None of the Defendants were disciplined for their actions.

62.     Indeed, upon information and belief, and based on Aurora's responses to open records requests, Aurora has provided no additional training to any Defendant, or other Aurora officers, related to the incident with Plaintiff.

63.     Defendant DePass was the Aurora employee with the final policymaking and supervisory authority on the scene, and he had authority over the subordinate law enforcement officers, Defendants Yazdani and Mason.

64.     Through Defendant DePass' own unlawful conduct of condoning the conduct of Defendants Yazdani and Mason, the City of Aurora ratified the unconstitutional practices of Defendants Yazdani and Mason.

**D.**     **Defendant Aurora's customs, policies, and/or practices caused the violations of Plaintiff's constitutional rights.**

65.     Defendants' treatment of Mr. Torres was pursuant to Aurora's custom, policy and/or practice of unlawful conduct, including but not limited to:

a.    Racially biased policing as evidenced by unnecessarily escalating tension, aggression and violence when policing people of color, using excessive force against people of color, and unlawfully detaining or arresting people of color suspected of at most minor law violations;

b.    charging victims of police brutality with crimes to cover up and justify unconstitutional uses of excessive force;

c.    unlawfully entering the homes and property of Aurora residents;

d.    failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and

e.    failing to adequately train its officers.

**1.    *Defendant Aurora has a custom and practice of racially biased policing.***

66.    Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of condoning and ratifying use of unnecessary aggression and excessive force against people of color.  As a result, it has become customary among Aurora police officers to use unnecessary aggression that escalates tension and the likelihood of violence when policing people of color and, correspondingly, to use excessive force against people of color. In other words, Aurora police officers customarily are unnecessarily aggressive with and use more force against people of color than when compared to Aurora police officers' treatment of white individuals.

67.    It is the longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of Aurora to permit law enforcement officers to use race and race-based animus as motivating factors in police decisions and actions, as well as to fail to supervise and to

15

train deputies in the rights of individuals to be free from such race-based decision making in law enforcement. This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated levels of force against people of color that would not otherwise be used against similarly situated white arrestees.

68.    It is the longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of Aurora to permit law enforcement officers to use any hesitation by people of color to comply with an officer's (legal or illegal) commands – even when officer safety is not jeopardized by the hesitation – as justification to use force. In other words, Aurora police officers commonly demand immediate and complete submission by people of color to any police directive, no matter how big or small and no matter whether the command is legal or illegal.  Failure by a person of color to utterly and immediately submit customarily triggers hostility, aggression, and violence by Aurora police officers.  This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated levels of force against people of color.

69.    Aurora officers customarily, and pursuant to the longstanding, widespread, deliberately indifferent customs of Aurora, falsely charge those against whom they use force with a crime (primarily with the resisting arrest, obstruction, and/or failure to obey a lawful order) so as to cover up their use of force. These trumped up and baseless charges are used to make the officers' use of force appear to be justified, when it is anything but.

70.    The incident involving Mr. Torres, standing alone, is sufficient evidence of these customs, policies and/or practices. Yet, there is more evidence of Aurora's unconstitutional customs, policies, and/or practices.

16

71.    On July 13, 2017, one Aurora officer choked-slammed an African-American woman, Vanessa Peoples, while police were performing a welfare check in her home.  Several other Aurora officers then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' misconduct and her failure to be 100% compliant with every single police directive (legal or illegal). Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, Aurora officers kept her hog-tied for 30 minutes with her shoulder dislocated. The Aurora officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed. Ms. Peoples settled her claims for $100,000 pre-litigation. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.

72.    On April 22, 2017, multiple Aurora police officers tased and assaulted Brandon Washington, an African-American man. The officers had responded to an automobile accident in which Mr. Washington was involved. Upon arriving on scene, the officers used grossly excessive force because Mr. Washington, while still clearly in shock and disoriented from the accident, questioned their commands that he exit his vehicle. In response to this perceived non-immediate compliance, Aurora officers almost immediately dragged Mr. Washington out of his vehicle. One officer tased Mr. Williams multiple times while other officers physically assaulted him. During the assault, Mr. Washington (who has asthma), kept yelling, "I can't breathe." To justify their use of force against a survivor of a recent automobile accident, Aurora officers charged Mr. Washington with a number of crimes, including resisting arrest.  Those charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers.

17

73.     On March 16, 2016, multiple Aurora police officers racially profiled Omar Hassan, an African American man, and ejected him from a coffee shop simply because he was an African-American man wearing a hoodie.  The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any criminal conduct.  Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here."  When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.  Aurora paid Mr. Hassan to settle his legal claims.

74.     On February 19, 2016, Auroras officers stopped and detained Darsean Kelley simply because he was an African-American man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained.  Mr. Kelley complied with officers' orders but also asserted "I know my rights" just as one officer tased him in the back.   The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed a crime or was armed or dangerous. To cover up the illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order.  That charge was eventually dismissed, but Aurora found no misconduct chose not to discipline any of the officers involved in this unconstitutional detention and use of excessive force.  Aurora paid Mr. Kelley $110,000 to settle his legal claims prelitigation.

75.     On December 22, 2015, several Aurora officers assaulted OyZhana Williams, an African-American woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer

tackled Ms. Williams, choked her, slammed her head against the ground and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims.

76.    On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled African-American man, out of his home under threat of force, despite the fact that the officers had no warrant and no exceptions to the warrant requirement justified a warrantless arrest in the home. After Mr. Crews complied with the two Aurora officers' illegal commands to exit his home in the middle of the night, the officers forcefully threw him to the ground. The officers assaulted Mr. Crews only because he had momentarily delayed complying with their illegal commands in order to try prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge dismissed the charge halfway through Mr. Crews' trial. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims.

77.    On March 6, 2015, an Aurora police officer shot and killed Naeschylus Vinzant-Carter, an unarmed African-American man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon

information and belief, Aurora did not discipline any of the involved officers for this use of excessive force.

78.     On July 23, 2011, an Aurora police officer conducting an impromptu police undercover investigation shot and killed Juan Contreras, a Hispanic man. Mr. Contreras had found a set of lost car keys and was attempting to return them to the owner when he was wrongfully suspected of committing a minor crime, and Aurora police shot and killed him. Aurora paid $400,000 to settle Mr. Contreras' claims.

79.     On December 18, 2010, Aurora police officers used excessive force in their brutal treatment of Rickey Burrell, an African-American man lying helpless in his bed after suffering a seizure. The officers had responded to a 911 call from Mr. Burrell's family. Rather than render assistance, Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, and handcuffed him. The officers proceeded to roughly drag Mr. Burrell outside, though he was clad only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions.  Aurora paid $100,000 to settle Mr. Burrell's claims.  Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.

80.     On February 12, 2009, Aurora police officers used excessive force in effecting the arrest of Carla Meza, a Hispanic woman. Aurora officers responded to a domestic violence report after Ms. Meza was accused of assaulting her girlfriend. Officers handcuffed Ms. Meza and proceeded to make homophobic remarks towards her before one of the officers kicked her in the head while she was handcuffed, breaking her eye socket. The officer kicked her in the head

20

because she refused to comply with his unlawful commands. The officer was found to have used excessive force by an internal investigation.

81.    On March 23, 2008, multiple Aurora police officers unlawfully entered the home of, and tased, Duane Williams, an African-American man. The officers had been called to Mr. Williams' home for a disturbance. Upon arrival, they unlawfully entered Mr. Williams' home without permission and ordered him to the ground. When Mr. Williams questioned why the officers were in his garage, they tased him. Aurora police tased Mr. Williams multiple times, hit him with batons, and placed him in a choke hold. Mr. Williams suffered a compound fracture to his leg that required the insertion of a permanent metal rod and screws. Mr. Williams' claims against Aurora were settled in 2010.

82.    In June 2006, an Aurora police officer choked, slapped, and slammed to the ground twelve-year-old Cassidy Tate, an African-American girl. The officer had accused the girl's mother of illegally parking in a handicapped spot, despite the fact that Ms. Tate's mother had a handicap placard and used portable oxygen. In contacting Ms. Tate and her mother, the Aurora officer stated, "can you believe these fucking N's," which was a reference to the word "nigger." Ms. Tate's claims settled for $175,000. Instead of disciplining the racist and brutal officer, Aurora later promoted him. Later, in June 2017, the same officer who brutalized Ms. Tate was caught on body camera footage referring to African-Americans as "Alabama Porch Monkeys."  The officer was terminated by the Aurora Police Department, but then the City of Aurora purposefully reinstated him.

83.    In December 2003, Aurora officers shot and killed Jamaal Bonner, an African-American man, during a prostitution sting. When an Aurora SWAT team burst into his hotel

room, Mr. Bonner, who was unarmed, stood up in surprise. Aurora officers tased him, causing him to go the ground face down. Though Mr. Bonner had already been effectively tased, was surrounded by Aurora police officers, and was not armed, an Aurora officer shot Mr. Bonner three times, killing him. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.  Aurora paid $610,000 to settle the family's legal claims.

84.    Through Aurora's continuous ratification of racially biased policing and use of excessive force against people of color, Aurora has condoned the conduct of Defendant officers.

85.    Defendant Aurora failed to properly train and supervise its officers to avoid the use of racially-biased policing, excessive force and unlawful seizure.

86.    Defendant Aurora knew or had constructive knowledge, based on the customary, racially biased actions of its officers and Defendant Aurora's condoning of those actions, that its officers would be influenced by racial bias when deciding to utilize excessive and unnecessary force against people of color like Mr. Torres.

87.    Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of the Defendant officers, but failed to do so.

88.    Defendant Aurora's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of their violation of Mr. Torres' constitutional rights.

> **2.    *Defendant Aurora has a custom, policy, and practice of failing, in the face of obvious constitutional violations, to find officers engaged in wrongdoing and to discipline officers.***

89.     Aurora's failure to find wrongdoing and failure to discipline officers in this case and in the cases described above reflects a custom, policy or practice of ratifying blatantly illegal and improper conduct. These ratifications evidence that such police conduct is carried out pursuant to the regimen of training provided by Aurora, and that such conduct is customary within Aurora's Police Department.

90.     It is Aurora's responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify, their improper conduct, so that officers can learn from their mistakes and perform their jobs correctly moving forward. Aurora's failure to do so has led to its officers' unconstitutional conduct, and will lead to more unconstitutional conduct in the future.

### 3.     *Defendant Aurora Has A Custom, Policy, and Practice of Condoning Illegal Home Invasion.*

91.     When Defendant Officer Yazdani ordered Mr. Torres to exit his garage under threat of arrest if he failed to do so, that order constituted a seizure of Mr. Torres in his home. Because Officer Yazdani had no warrant and no exceptions to the warrant requirement applied, this warrantless arrest of Mr. Torres in his home violated his Fourth Amendment right to be free from unreasonable seizure.

92.     Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of condoning and ratifying illegal home invasions so that it has become customary among Aurora police officers to ignore the constitutional sanctity of an individual's home.

93.     It is the longstanding, widespread, and deliberately indifferent custom, habit and/or practice of Aurora to permit law enforcement officers to illegally enter homes or illegally

23

demand a resident exit his or her home, as well as to fail to supervise and to train deputies in the rights of individuals to be free from such illegal home invasions.  This habit, practice or custom is exemplified by illegal arrests in the home, as in the case of Mr. Torres and Mr. Crews (described above), as well as illegal entry described in the following paragraph.

94.     In a case with some striking similarities to the instant case, on June 23, 2016, just a few months prior to Defendants' violation of Plaintiff's constitutional rights in this matter, multiple Aurora police officers unlawfully entered the home of Kevin Ravenscroft, Jamie Salazar, and Nicolas Torres. The Aurora officer who unlawfully entered the home justified his action by stating that there was music playing. It was clear that he had been trained, incorrectly, that a claim of loud music was a valid basis for entering a home. After illegally entering, the officer placed Mr. Ravenscroft under arrest and searched his entire home. After investigation, Aurora found that the first officer at the scene had illegally entered the home, but neither investigated nor disciplined the other officers who also entered the home. Aurora paid Mr. Ravenscroft, Ms. Salazar, and Mr. Torres $150,000 to settle their constitutional claims, as well as their open records claims related to Aurora concealing reports about the incident.

### E.     Defendant Aurora is liable for the Individual Defendants' violation of Mr. Torres' rights.

95.     Defendants' unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice, even if not authorized by written law or express municipal policy, so pervasive and well-established as to constitute a custom or usage with the force of law.

96.     Through Defendant Aurora's continuous ratification of unlawful arrest, excessive force, use of escalated force against people of color, charging victims of police abuse with

24

crimes to cover-up excessive force, and unlawful home invasions, Defendant Aurora has condoned the Individual Defendants' illegal conduct.

97.   Defendant Aurora failed to properly train and supervise its employees to avoid unlawful arrests, excessive force, and unlawful home invasions.

98.   Defendant Aurora knew, or had constructive knowledge, that its employees would carry out unlawful arrests, excessive force, and unlawful home invasions, violating residents' constitutional rights.

99.   Defendant Aurora was deliberately indifferent to Plaintiff's constitutional rights, because Aurora knew that individuals in Plaintiff's position would be at a substantial risk of suffering dangerous consequences from Aurora's failure to properly train and supervise its employees.

100.   Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of such employees, but intentionally chose not to do so.

101.   Defendant Aurora's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of Defendants' violation of Plaintiff's constitutional rights.

102.   Defendant Aurora's custom, policy, and practice of encouraging, condoning, tolerating, and ratifying unlawful arrest, excessive force, and unlawful entry of homes, as described herein, and the subsequent cover-ups of such constitutional violations, were the moving force behind, and proximate cause of, Defendants' violation of Plaintiff's constitutional rights.

25

103.    Defendant Aurora's acts or omissions caused Mr. Torres damages in that he suffered physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

104.    Defendant Aurora's actions, as described herein, deprived Mr. Torres of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 - 4th Amendment*
*Excessive Force*
(Against All Defendants)

105.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

106.    At all relevant times hereto, the Individual Defendants were acting under the color of state law in their capacities as Aurora law enforcement officers.

107.    Mr. Torres had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

108.    No Individual Defendant at any time had a legally valid basis to seize Mr. Torres' person.

109.    The Individual Defendants unlawfully seized Mr. Torres by means of excessive physical force.

110.    The Individual Defendants had no warrant authorizing any seizure of Mr. Torres' body.

111.    Each of the Individual Defendants at Mr. Torres' home on November 21, 2016, failed to intervene to prevent the other Defendants from violating Mr. Torres' constitutional rights, and is thereby liable for such failure to intervene.

112.    The Individual Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

113.    Mr. Torres had committed no crime (nor could any of the Individual Defendants have reasonably believed he had committed any crime) that would legally justify a warrantless arrest inside one's home, gave the officers no reason to fear for their safety, was obviously unarmed, and was not resisting arrest or fleeing.

114.    Accordingly, the Individual Defendants' acts of wrenching Mr. Torres' arm(s) behind his back (multiple times) and slamming Mr. Torres to the ground (multiple times) each constituted excessive force.

115.    The other Individual Defendants' failure to intervene and stop the assault of Mr. Torres renders them liable for this excessive use of force.

116.    The Individual Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally- protected rights.

117.    Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the proper use of physical restraint and force, resulting in the use of excessive force. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the constitutional limits on use of force, particularly in the face of an individual's brief hesitation to comply with a police directive, and how to avoid

27

engaging in racially-biased policing, particularly by avoiding unnecessary use of aggression and unnecessary escalation of tension when policing people of color.

118.    Aurora's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Aurora.

119.    In light of the duties and responsibilities of personnel of Defendant Aurora – who must make decisions regarding when forcible restraint and use of physical force is appropriate – the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

120.    Such failure to properly train, supervise, and/or discipline constitutes an unconstitutional policy, procedure, custom, and/or practice.  It was a moving force behind and proximate cause of the Individual Defendants' unreasonable seizure and use of excessive force against Mr. Torres.

121.    Mr. Torres has been and continues to be damaged by the Individual Defendants' unreasonable seizure and use of excessive force. He has endured and continues to endure physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

122.    Each Individual Defendant's acts or omissions described herein, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Mr. Torres' damages.

28

123. At the time when the Individual Defendants unlawfully apprehended Mr. Torres, wrenched his arms behind his back multiple times, and picked him up and slammed him to the ground multiple times without any basis, Mr. Torres had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

124. Any reasonable law enforcement officer knew or should have known of this clearly established right.

125. The Individual Defendants' actions, as described above, were motivated by intent to harm Mr. Torres.

126. The Individual Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Torres' federally protected rights.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 - Fourteenth Amendment*
*Denial of Equal Protection*
(Against Defendants Aurora, Yazdani, and DePass)

127. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

128. Defendants Yazdani and DePass were acting under color of state law in their actions and inactions at all times relevant to this action.

129. At the time of the complained of events, Mr. Torres had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

130.    Mr. Torres' race was a motivating factor in the Individual Defendants' decisions to order him to exit his home, detain him, and use excessive force against him. Defendants Yazdani and DePass acted with the purpose of depriving Plaintiff of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment.

131.    Defendants Yazdani and DePass treated Mr. Torres less favorably than his similarly situated White counterparts.

132.    There was no rational basis for Defendants Yazdani's and DePass' discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

133.    Defendants Yazdani and DePass seized Mr. Torres in his home when they ordered him to exit his garage, detained him, and used excessive force against him, as described herein, without reasonable suspicion or probable cause to believe Mr. Torres had committed a crime that would legally justify a warrantless arrest inside one's home. No exceptions to the warrant requirement justified a warrantless arrest in the home.

134.    Defendants Yazdani and DePass intentionally, willfully and wantonly seized Mr. Torres by requiring him to exit his home and used excessive force against him, as described herein, wholly or in part due to his race.

135.    Defendants Yazdani's and DePass' actions were objectively unreasonable in light of the facts and circumstances confronting them.

136.    Defendants Yazdani and DePass engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to and reckless disregard of Mr. Torres' federally-protected constitutional rights.

137.   Defendant Aurora failed to properly train, supervise, and/or discipline its employees regarding the constitutional requirement not to engage in racially-based policing, resulting in the Individual Defendants' unlawful seizure of Mr. Torres in his home and their use of excessive force. Defendant Aurora particularly failed to properly train, supervise, and/or discipline its employees regarding the proper use of physical restraint and force against people of color, and the prohibition on using racially-based excessive force.

138.   Aurora's inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Aurora.

139.   In light of the duties and responsibilities of personnel of Defendant Aurora – who must police people of color on a regular basis – the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

140.   Such failure to properly train, supervise, and/or discipline was a moving force behind and proximate cause of Defendants Yazdani's and DePass' racially-biased treatment of Mr. Torres, and constitutes an unconstitutional policy, procedure, custom, and/or practice.

141.   Defendants Yazdani and DePass engaged in this conduct and were exonerated for their racially-based conduct pursuant to Aurora's municipal customs, policies and/or actual practices described herein.

142.    Defendant Aurora's failure to train and/or supervise, as described herein, was a legal and proximate cause of the Mr. Torres' injuries.

143.    Upon information and belief, Defendant DePass was the employee with the final policymaking authority on the scene, and had authority over his subordinate law enforcement officers.

144.    Through Defendant DePass' own unlawful conduct (which condones the conduct of the other Defendants) and otherwise, Defendant DePass, on behalf of Aurora, ratified the Defendants' unconstitutional practices.

145.    As a direct and proximate result of Defendants Yazdani's and DePass' actions, Mr. Torres has suffered and continue to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

**THIRD CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Fourth Amendment Violation*
*Unlawful Seizure/Warrantless Arrest*
(Against Defendants Aurora and Yazdani)

146.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

147.    The Individual Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

148.    Mr. Torres has protected Fourth Amendment interest against unreasonable governmental intrusion into his home, including his garage which any reasonable officer would have known was within the curtilage of Mr. Torres' home.

149.    Nonetheless, Defendant Yazdani unlawfully demanded that Mr. Torres exit his garage upon threat that if he failed to do so immediately, he would go to jail.  When Mr. Torres

32

complied with the command under threat of arrest, Defendant Yazdani effectively arrested Mr. Torres inside his home.

150.    The officers had no warrant and no exceptions to the warrant requirement justified a warrantless arrest in Mr. Torres' home.

151.    Defendant Yazdani's actions were objectively unreasonable in light of the circumstances confronting him.

152.    Defendant Yazdani engaged in these actions intentionally, recklessly. willfully, and wantonly.

153.    Defendant Aurora failed to properly train, supervise and/or discipline its employees regarding the proper basis for seizing residents in their home, including by demanding that a subject exit his residence, which contributed to the individual Defendants' improper and unwanted seizure of Mr. Torres while in his home.

154.    Aurora's inadequate training, supervision, and or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Aurora.

155.    In light of the duties and responsibilities of personnel of Defendant Aurora – who must make decisions regarding when seizure of an individual in his home, including by demanding the individual exit his home, is appropriate under the Fourth Amendment – the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

33

156.    Defendant Aurora's failure to properly train and supervise was the moving force behind and proximate cause of Defendants' unlawful seizure of Mr. Torres in his home, and constitutes an unconstitutional policy, procedure, custom and/or practice.

157.    Mr. Torres has been and continues to be damaged by Defendants' unlawful seizure of him in his home, because such conduct caused and causes him physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

158.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Mr. Torres' damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

  a.  Declaratory relief and injunctive relief, as appropriate;

  b.  Actual economic damages as established at trial;

  c.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

  d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

34

e. Issuance of an Order mandating appropriate equitable relief, including but not

limited to:

   i. Issuance of a formal written apology from each Defendant to Plaintiff;

   ii. The imposition of policy changes designed to avoid future similar
       misconduct by Defendants;

   iii. Mandatory training designed to avoid future similar misconduct by
        Defendants;

   iv. Imposition of disciplinary action against appropriate employees of Aurora;

f. Pre-judgment and post-judgment interest at the highest lawful rate;

g. Attorney's fees and costs; and

h. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 20th day of November 2018.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*

_____
Mari Newman
Andrew McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
mnewman@kln-law.com
amcnulty@kln-law.com

IN COOPERATION WITH THE AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF COLORADO

*s/ Rebecca Wallace*

_____

Rebecca T. Wallace
Mark Silverstein
303 E. 17th Street
Denver, Colorado 80203
Phone: (720) 402-3104
rtwallace@aclu-co.org
msilverstein@aclu-co.org

ATTORNEYS FOR PLAINTIFF